Mr. Marshall, would you kindly call the last case in the court's docket, please? Yes, Your Honor. This case is on the docket 16-22. The people of the State of Illinois, Appellant Kathleen v. Tito Trejano, Defendant Appellant. Arguing on behalf of the Defendant Appellant, Ms. Galvin, Tito. Arguing on behalf of Appellant Kathleen, Defendant Trejano. Thank you. Second, on behalf of the Defendant Appellant, you may proceed. You may please the court. My name is Yasmin Ekin, and I represent the Appellant Tito Trejano. Mrs. Trejano was convicted of the Class III felony offense of criminal neglect of an elderly person. The issues in this case are whether the State proved beyond a reasonable doubt the mental state for this offense, or that a good faith exemption contained in the statute did not apply to her. To convict Mrs. Trejano of criminal neglect of an elderly person, the State was required to prove that she knowingly failed to perform acts which she knew or reasonably should have known were necessary to maintain the health of an elderly person, and in this case, that was Richard Brown, and that her failure to do so caused him to be injured. Here, the State failed to prove the knowledge element of the offense, or under the facts of this case, that she was consciously aware that she was doing something wrong. Under the statute, is the State required to prove that the caregiver knew the specific injury or problem that would result? Not a specific injury, no, Your Honor. Here, one of the things they are required to prove is that she knowingly failed to act, and here, she did not knowingly fail to act. After she found that Mr. Brown had fallen to the floor, she repeatedly tried to help him up. She provided him with food and water. She called his regular caregiver and her employer at the Caregiving Agency for Health, and she took care of him until help arrived. Well, let's assume, well, you know, arguing admittedly, I should say, that those things did take place, he's on the floor for a total of about, what, four, four and a half hours? Four and a half hours, Your Honor. Why didn't you just call 911? People call 911 for emergency assistance, and there's nothing in the record to show that Mr. Brown was in physical pain or in such distress that Mrs. Trujano knew that calling 911 was required. She made all these other efforts, and even at the end of that four and a half hour period, if you're, I mean, that's central to the State's theory, but at the end of that four and a half period, nobody, including Richard's son-in-law and his daughter, who lived with him and saw him on a daily basis, observed anything about his condition which led them to believe that emergency assistance was required. He was an 85-year-old man on a hardwood floor, correct? Correct. Now, things finally changed. She did make these calls, did attempt to give him some sustenance and some water, and then somebody came home, correct? Yes. What if that person didn't come home until midnight? What was going to happen then? If that person, I mean, I think you have to look at the circumstances that were confronting her at the time and to see whether or not his condition was such that it signaled to her that emergency assistance was necessary. And, I mean, the other thing in this case is it's along a continuum, so there's a timeline of things that are happening. That's important. It's very important in evaluating her state of mind and looking at the judgment calls she's making at the time. So she discovers that he's on the floor between 10.30 and 11, and at that time she immediately, of course, she tries to pick him up. But there's no evidence that she sees signs of some type of physical pain or distress where a 911 call is necessary. Why did she call anybody? Well, she called for help. I think, you know, she realized that she needed help getting him up, but she continued to try to get him up. I don't think she, you know. Again, I mean, if you're going to call some people to try and help to get him up, because presumably you think it's not a good thing to leave an old man laying on a hardwood floor, as opposed to why not keep trying to take it to the next level, which is if I can't reach anybody, I'm just going to wait until the owner of the house comes home at 3.30? No, she calls while she's taking care of him. Again, she is taking care of him. She's calling, and yes, it may not have occurred to her to call 911 because she's not seeing any type of indication that the efforts she is making to take care of him are insufficient to take care of him until help does arrive. Well, I mean, he was injured as a result of being on the floor. I mean, that's a given, correct? He was injured. Right, but the injury wasn't discovered until the next day. But it was due to being on the floor. I mean, we had some testimony as to that fact, correct? That's correct. So, I mean, the issue of knowledge, then, is whether she was consciously aware that leaving him on the floor for four and a half hours practically certain, it was practically certain that the result could be caused, and the result in this case is an injury, correct? Correct. So, I mean, we're talking about the sufficiency of the evidence and a fact finder looking at this evidence, and we're going to reverse that because we think she did enough? Well, if you look at this, this is criminal knowledge. This is criminal knowledge. Right. So you're talking about framing someone, a criminal felon, who based on the circumstances confronting her at the time, first of all, she didn't fail to act. And then you look at she failed to perform acts which she knew or reasonably should have known were necessary, were necessary to maintain his health. There was nothing signaling to her that emergency assistance was necessary to maintain his health. And, again, that was the reaction of other people who knew him. She was a substitute caregiver. She had only cared for the Browns twice before. When Richard Brown's son-in-law came home and found him on the floor, Mr. Brown complained only of being tired, and his son-in-law put him to bed, and he didn't think that at that time we should even take him to the doctor or we should call for emergency assistance, we should call 911. And then when his daughter came home two hours later and her husband told her what happened, she didn't think, you know, oh, the circumstances were such. He fell on the floor, he was on the floor, and she went and checked on him, and he was sleeping. She didn't think that it was necessary for his health that they get immediate emergency care. I mean, if you're looking at what a reasonable person should think under these circumstances, you know, you can judge that by what people other than Tita, who knew him much better, thought as well. Well, what about the fact that one of the reasons that Chris, the son-in-law, I believe, said, you know, he's okay, that your client said, well, he had been on the ground for a little while. Then she said she extended that for a little longer, and eventually she said, I think, up to two hours, never really identifying the actual hours, so she's changing her story. Isn't that some evidence of I'm concerned, I did something wrong, I knew this wasn't the right thing to do? It may be concern in hindsight because of what happened the next day. The next day, Richard does show signs of being in physical pain. And so, yes, it may be concern in hindsight thinking, oh, my gosh, I made a mistake in judgment. But that is not criminal knowledge. That is not criminal neglect. I mean, that's human. That's being a human. And the fact of the matter is, is that I don't know that it would have made a difference when Chris came home and helped Richard back to bed if he had known, you know, four and a half hours had passed. Had he known that and still saw Mr. Brown in the same condition and Mr. Brown just said to him, I'm just really tired and I want to go to bed, I mean, I don't, again, I don't think that's evidence showing that 9-1-1, you know, a reasonable person would have called 9-1-1. I mean, going back to some very basic principles, as you know, when a challenge is made to the sufficiency of the evidence, we are required to view the evidence in the light most favorable to the prosecution, correct? Correct. There's also the very well-settled legal principles. We are not entitled to substitute our judgment for that of the jury, particularly as it relates to credibility matters. So when you look at those two principles, they're sort of pretty high deferential standards, aren't they? They are high standards, and I don't think they weren't met here. Even viewing the evidence in the light most favorable to the state, you have to look at Mrs. Trujano's state of mind and whether she had knowledge at the time. Really, what you have to look at is that she should have known that calling 9-1-1, despite the fact that she doesn't see signs of him being in physical distress, that there's no evidence that this is an emergency, that despite the fact that she's doing everything she can to take care of him until help arrives, you have to find that she knew that she should have, instead of, you know, in addition to those things, instead she should have called 9-1-1, and she knew that and she just knowingly failed to do that. As we sometimes talk about consciousness of guilt, Justice Hutchinson alluded to this, why would she minimize, why would she give conflicting statements to try and minimize the time that the gentleman was on the hardwood floor if there wasn't some consciousness of guilt? I think she started by saying a little while. A little while to her could have meant, you know, four and a half hours. You have to also remember that this time period was broken up into time periods. So between 10-30, when she is taking, she's trying to get him up, she's providing him food and water, she's asked him if he's okay, and in the meantime also his wife, who has severe Alzheimer's and by all accounts required more care, calls her away. She finds that she's soiled herself. She has to clean that up. She says that takes some time. All this is happening in the first period. Then Kay Jensen calls her back, and Tita tells her what happened, and obviously Kay knows that she called two and a half to three hours before, but Kay doesn't say, that sounds like an emergency, call 911. She says in her exact testimony, and the problem is recollections were not great in this trial because it's six years after the incident. But her exact testimony was, I told Tita, call Chris. He should be home soon so that he can help her out with Mr. Brown. I mean, Tita, and I think it's a reasonable understanding, she understood this instruction to mean that she should wait for Chris because he would be home shortly, and then he would help her. And as soon as he got home, as soon as he got home, she called him, and he came over and helped her. But how does that bear with changing the stories here at 10-30? That, you know, I guess I don't think that that is that probative of consciousness of guilt. No. It could be, yes, it could be fear that looking back in hindsight, oh, my goodness, he needed more help than I realized, or this maybe did need more immediate assistance. But given the circumstances that were in front of me at the time, and there's no evidence, I didn't understand that because I asked him if he was okay. I was trying to take care of him. When I got this message from Kay, she told me to, you know, wait until Chris got home. Kay is their regular caregiver. You know, she could reasonably rely on her advice. So the fact that, you know, at first she says a little while, and then it changed to two hours after, you know, she finds out that it's more serious than what anybody thought, that anybody thought, including all his family members who know him so much better. I don't think that, you know, this case hinges on some inkling of a consciousness of guilt. I mean, it cannot turn on that. I'm only bringing it up because, as you all know, in any case, when a witness, defendant or just any witness, gives conflicting versions of what happens, that usually weighs against their credibility, doesn't it? I mean, that's a pretty well-settled principle, isn't it? She didn't give conflicting versions of the events that happened, though. The time frame, which is really, I think, one of the key elements here. If he had been laying on the floor for 15 minutes, that would be different than four and a half hours. Well, I mean, I don't, I guess I disagree with that. It's probative of having her, I mean, saying that she is criminally neglectful. Well, wouldn't the time frame, isn't that one of the key components of this whole case? Are you saying that if he was on the floor for 20 minutes versus 10 hours, it wouldn't make a difference? No, I'm saying, you have to look at what the state's evidence was of his condition at the end of four and a half hours. Nobody at the end of four and a half hours, nobody thought that it was necessary to get him emergency care. And nothing leading up to that four and a half hours indicated that it was necessary to get him emergency care. And all during that time, Tina is trying to help him. I mean, she's not neglecting him. You know, she is trying, she can, and I think in her mind, she thinks maybe I can still try to get him off. She continues, she repeatedly tries to help him. She gives him nourishment. I mean, I just, this is not criminal. This is, again, and I think it's easy to say, knowing that the next day, yes, he suffered from this injury. It's easy to say that, well, we would all, you know, don't you know, of course I would have called 911. But that's, you know, hindsight is very distorting. And you have three medical doctors, you have three doctors who also testify, yes, he suffered from this condition. The symptoms of it are not visible. None of them said that Tina would have known that he was injured. Not one of those doctors said that, yes, she would have known that he would have suffered from this injury. But isn't it fairly apparent from her size, and I understand she's a smaller woman and she's in her 70s herself, how could she ever have thought she could get him off the floor? I think she was just very much trying to help him. I think she thought she wanted to get help. That's why she called Kay Jensen. That's why she called the caregiving agency. She was hoping for help. And those are the people that she knew to call. And when she couldn't reach them, she desperately was trying to get them up. And I guess maybe I see that my time is up, but that, you know, maybe that is where the good faith exemption comes in. She made good faith, honest efforts to take care of him. There was nothing about her actions that shows any malice towards him. She did the best she could under the circumstances that were confronting her. I mean, the fact that she might not have called 911 because that specific option did not occur to her because there were no signs that he needed emergency assistance, that doesn't take away from everything she did do to take care of him. So either because the evidence doesn't show that she possessed a criminal state of mind here or because the state failed to prove that that exemption did not apply, we would ask that this court reverse her conviction. Thank you, Mr. Trejo. Mr. Trejo, on behalf of the people. Good day to the court, counsel. Adam Trejo on behalf of the people of the state of Illinois. Defendant contends that there weren't any signs of distress. However, the evidence presented at trial, which this court has pointed out, should be viewed in light most favorable to the state. When the defendant testified, Richard cried out for help. Those were the words from the defendant. He's crying out for help by the only individual who's taken on this responsibility to keep him safe. That is the first sign that he is in distress, crying for help. That was when he fell out of bed, right? When he fell, yeah. Well, we don't know how much time elapsed from the time he fell to the time the defendant discovered him. We know that the defendant discovered him around 10.30 a.m. or 11 a.m. when she testified that he heard the defendant cry out for help. That's the first sign. There's no evidence that he's continually crying, saying he's injured or help me, help me, get me up. She didn't say continual crying. This is the first time she discovered him. He heard a cry for help. I don't know the specific words, but it was a cry for help. Now, you don't need to have a medical degree to understand that an 85-year-old man who she knew his physical health was deteriorating, that a fall onto the hardwood floor would probably lead to an injury. That's common sense. You don't need to be a doctor. Well, that's true. But Ms. Aiken's point perhaps is more subtle. She's saying, well, okay, obviously we can all agree to know it's not different to be laying on a hardwood floor for a period of time. But she's making a subtle point. In the absence of a visible injury, okay, how would she know the extent of what's going to happen? And is that a part of the equation? It is. I feel it's a misstatement to characterize that she saw him lie on the floor. His body was contorted. When Chris arrived, he said Richard's legs were bent underneath his body with his feet pointed on either side.  His body is contorted. And that's an indication that you should know that leaving him on the floor for four and a half hours will probably aggravate an existing injury from the fall or will probably lead to an injury. His positioning of his body is not in a comfortable state. Furthermore, she didn't investigate. She didn't check to see if there was an injury. You don't hear any testimony. I didn't see. It's true that she couldn't pick him up. She certainly can pick up a leg. She certainly can see, is there blood? Are there bruises? Are there abrasions? When Christopher arrived at 3.30 p.m., he sat him on a chair and he cleaned up blood. There was blood. She failed to identify that. She failed to find signs of an injury. Is blood enough to call 911 or to get some other help? It's multiple character. It's multiple factors, honestly. That's one of them. It's the age. It's the time period, obviously. The longer you leave him on the floor, that emergency just increases and increases and increases. It's her knowledge that you know he's not in the best shape of health. It's all those factors combined that lead a reasonable person to understand, I need to get him off the floor. And the longer it's taking, the more chances that if an injury, if he did sustain an injury, that's just going to get aggravated or an injury might manifest itself as he's laying on the floor. What significance should we place on the fact that family members who knew him best did not call 911, did not take him to the hospital or the emergency room when they arrived home? Well, for two reasons. One, it's not their duty. They hired a primary caretaker to take care of Richard and Aileen Brown while they were home. While they were home, that duty is still on the defendant. She's still on the job when they were home. It may not be their duty yet, but it goes to her. The argument is it goes to her knowledge that this is not hurting him lying on the floor. They didn't have the information that the defendant had. They didn't know how long he was on the floor. They didn't know what type of assistance, if any assistance was provided to him. As far as Chris knew, he had just been on the floor just a little while, as the defendant told him. If maybe he had been told it had been four and a half hours, maybe his reaction would have been different. But again, the defendant mislead him, lied to him, actually. And going on to the phone call, she called individuals who she knew were unavailable to assist. She testified that she knew that her employer, Joyful Hearts, was located very far from where that home was. She knew even if she had called, she couldn't get assistance, physical assistance from her. She could have given her directions. You know, she could have called. Calling your employer is not a usual circumstance because you're hopeful that somebody is going to help you and tell you what to do. But she didn't know any of the voicemail. These are the things that she should have done. She should have, if she had her number, texted her, left a voicemail, this is the state of my client that I've been entrusted to keep safe. When she called Kay, she didn't leave a voicemail. When she called Kay, she didn't tell him specifically how long he had been on the floor. When she had called Kay, she didn't ask what are the numbers of other family members I can contact. When she called Kay, she didn't ask what can I do. Should I put a pillow underneath his leg? Should I move him around? Elderly people get bed sores in a comfortable position just after an hour. After four and a half hours on a hardwood floor when his body is contorted, she should have put a pillow. She could have contacted a neighbor. She could have called 911. And that's what's the most stressful part of this case. The solution was so simple, so fast, so easy to do. Pick up a phone. She says in hindsight, of course, these things become obvious. What about the good faith exception under the Act that provides that a caretaker is not liable for criminal neglect of an elderly person? If they've made a good faith effort to provide good health care and through no fault of their own have been unable to provide such care. She's pointing out she's a very small woman, didn't have the strength to move him herself, provided him with some water and sustenance. Does the good faith exception apply here? If not, why not? It does not. And quite frankly, lying, explicitly lying right after Chris came home for how long he had been on the floor, that's not good faith. You're not acting in good faith when you're lying for how long an 85-year-old man had been on the floor on a hard surface with his body contorted. That's not good faith. When Kay directed her to call Chris, she waited two hours. That's not a good faith effort. That's not a good faith exemption. Two hours she waited. Kay told her, call Chris at 1.30 p.m. She calls him when he gets home. That's when she calls him and lets him know. Two hours is not a good faith effort after you've been directed to call Chris. It's just not. Leaving an 85-year-old man for an half hour, not calling anyone else, is not good faith. And I have no other questions. The people who are on the brief, they'll argument and respectfully request that this Honorable Court uphold the defendant's conviction and sentence. Thank you.  You're welcome. Thanks. Second, you may address the Court of Rebuttal. I just want to focus on what counsel talked about Chris. Chris and how he found Richard in a contorted position when he came home. I mean, there's no evidence that he was in this position the entire four-and-a-half hour period of time. And, in fact, it wouldn't make sense because if Tito was able to provide him with water and food, he certainly would not have been in that position. So there's simply no evidence of that. To call her saying that he's been on the floor a little while a deliberate lie, I think that's a stretch. She said a little while. Okay, she didn't precisely say he's been on the floor four-and-a-half hours. She didn't say five minutes either. Okay, she said a little while. He attaches now and time to the fact that she called individuals she knew weren't there. She called Kay because, as she testified, she found a note with Kay's phone number on it saying, call if anything happened. And that was partially corroborated by Kay, who said, yes, I left notes for Tina, and Tina, yes, I left her my phone number. But I just can't recall if it said on their call me if something happened. You know, when she counsel talks about how when she called Kay, she didn't ask what should she do, I think we can pretty much safely assume when she called, when Kay called back and she told her what happened, it was exactly for that purpose, what should I do. And this idea that it was going into the good-faith section that Kay told her to call Chris, she didn't say call Chris right away, right now. She said, call Chris, he will be home soon and he will be able to help you. It is not an unreasonable interpretation whatsoever for Tina to think that means wait for Chris, he'll be home soon, and to wait for him thinking he will be home shortly. So for all these reasons, Your Honor, Tina Trujano did not have, this is not a case of criminal knowledge. This is not a case where she had a criminal intent. This is a case of, in hindsight, mistaken judgment. It was an error in judgment. It was being human and she should not be guilty. The evidence simply failed to show that she was guilty of criminal neglect of an elderly person or that the good-faith exemption in her case does not apply. Did the defendant testify that it took her about an hour to attend to the wife when she called out? She said, when she testified on direct, she said it took some time, and the state wanted to clarify and ask was it less than an hour. She said less than an hour. So, I mean, it could be anywhere, I assume anywhere from 30 minutes, 45 minutes, less than an hour, it could be 55 minutes, but, you know, it was during that first window of time of her continually trying to get him up and providing him nourishment and making those phone calls and then also, yes, being called by Mrs. Brown away. Did Mrs. Trujano have any problems with the English language or was she able to understand and respond appropriately? You know, that did not come up, I think, in terms of her testimony. She did have an interpreter there during trial with her. But when she talked to Chris, there was no interpreter present, to the best of your knowledge. To the best of my knowledge. I can't say that the record shows that. Yeah. Thank you, Your Honor. Thank you. Thank you. All right, I'd like to thank both counsel for the quality of their arguments in this interesting case here this morning. The matter will be taken under advisement, and the court will, of course, issue a written decision in due course. We will stand adjourned for the day, subject to call. Thank you.